**2016 UT App 190**

# THE UTAH COURT OF APPEALS

ADRIAN GORDON,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20140518-CA
Filed September 1, 2016

Third District Court, Salt Lake Department
The Honorable John Paul Kennedy
No. 090917952

Matthew M. Durham, David J. Williams, Jill M.
Pohlman, and Jensie L. Anderson, Attorneys
for Appellant

Sean D. Reyes and Erin Riley, Attorneys for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGE
GREGORY K. ORME and SENIOR JUDGE RUSSELL W. BENCH
concurred.[1]

TOOMEY, Judge:

¶1     Adrian Gordon appeals the district court's order granting
summary judgment in favor of the State and dismissing his
petition for post-conviction relief with prejudice. We affirm.

---

1. Senior Judge Russell W. Bench sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2    Lee Lundskog[2] was found dead outside a convenience store in Salt Lake County in the early morning of September 29, 2001. The State's chief medical examiner (Medical Examiner) conducted an autopsy and determined that the manner of death was homicide, caused by numerous blows to Lundskog's head. An eyewitness, Gustavo Diaz-Hernandez, reported that he saw someone repeatedly kicking and stomping Lundskog's head. According to Diaz-Hernandez, Lundskog's attacker was a muscular black male with short hair wearing a light-colored shirt, baggy shorts, and white tennis shoes. Gordon fit this description and was filmed by the store's surveillance video camera around the time Lundskog was killed. Diaz-Hernandez later identified Gordon as the assailant. Another witness, Robert Mellen, saw Gordon wave Lundskog toward him shortly before Diaz-Hernandez witnessed someone stomping on Lundskog's head. The surveillance video corroborated the timeline of events testified to by Diaz-Hernandez and Mellen, but did not capture the murder itself.

¶3    Gordon was arrested for Lundskog's homicide and was ultimately convicted of first-degree murder after a bench trial. Gordon appealed, arguing the evidence was insufficient to support the verdict. The Utah Supreme Court affirmed the conviction, concluding that "[a]mple evidence supports

---

2. Typically this court does not use victim and witness names in a decision, but their identities in this case are well known and were published in the Utah Supreme Court's decision on Gordon's direct appeal. *See generally State v. Gordon*, 2004 UT 2, 84 P.3d 1167. Thus, "obscuring [Lundskog's and the witnesses' identities] in this decision would serve no purpose." *See State v. Chavez-Reyes*, 2015 UT App 202, ¶ 1 n.2, 357 P.3d 1012.

Gordon's conviction." *State v. Gordon*, 2004 UT 2, ¶¶ 1, 14, 84 P.3d 1167.

¶4     Thereafter, Gordon arranged for new counsel, who began collecting documents related to his case. On October 13, 2008, the police department provided Gordon's attorneys with a CD containing documents related to its investigation. Upon reviewing the CD, Gordon's attorneys discovered images of some handwritten notes (the Notes) made by a detective (Detective) that were never disclosed to Gordon's trial counsel. Detective wrote the Notes during the autopsy of Lundskog's body, and they contain Detective's own observations and memorialize statements made by Medical Examiner. The Notes appear to say "Not characteristic of 'Baseball Bat'" "Instrument" "More rough & uneven Edges & surface." In addition, according to Gordon, he learned for the first time on October 23, 2009, that a blood-spattered cement fence panel found lying next to Lundskog's body was not preserved as physical evidence.

¶5     On October 28, 2009, Gordon filed a petition for relief pursuant to the Post-Conviction Remedies Act (PCRA), claiming that his constitutional rights to due process and to the effective assistance of counsel were violated. The petition raised three grounds for relief. First, Gordon alleged that his right to due process was violated when the State withheld the exculpatory evidence contained in the Notes. Second, Gordon alleged that his right to due process was violated when the police failed to collect or preserve the cement panel that was "critical physical evidence from the crime scene." Third, Gordon alleged that if the court determined that the Notes or the cement panel were available to him at trial or could have been discovered through reasonable diligence, his trial counsel was constitutionally deficient for failing to discover or present the Notes or the cement panel at trial and for failing to present expert testimony to refute the State's evidence as to the manner of Lundskog's death.

¶6 The parties filed cross-motions for partial summary judgment on Gordon's first ground for relief.[3] Gordon argued that his due process rights had been violated by the State's failure to disclose the Notes before trial, whereas the State contended that Gordon suffered no prejudice from the suppression of the Notes. The district court agreed with the State. The court first explained that the parties agreed the State suppressed the Notes and that, for purposes of summary judgment, a reasonable inference existed that the Notes were favorable to Gordon. The only remaining issue, as the court further explained, was whether Gordon was prejudiced by the State's failure to disclose the Notes. The resolution of this question turned on whether the Notes were material, that is, whether their suppression undermined confidence in the outcome of Gordon's trial.

¶7 The district court explained that although the precise implication of the Notes was unclear, it accepted Gordon's interpretation: the words "Not Characteristic of 'Baseball Bat,'" "Instrument," "More rough & uneven Edges and surface" referred to the instrument involved in the attack. Put another way, the Notes suggested that the instrument involved in Lundskog's murder had more rough and uneven edges and

---

3. The State moved for summary judgment and sought to dismiss the entire petition on the basis that Gordon's claims were time-barred. The district court denied this aspect of the State's motion. It noted that the PCRA's one-year statute of limitations period begins to run when the petitioner knew or should have known, in the exercise of reasonable diligence, of the evidentiary facts on which the petition is based, and it ruled that questions of fact precluded summary judgment on this basis. It explained, "The Court cannot conclude as a matter of law that Gordon knew or should have known of the evidentiary facts underlying his Petition prior to October 28, 2008."

surface than a baseball bat.[4] The court concluded that the Notes were not material and Gordon was not prejudiced by the State's failure to disclose them before trial. It reasoned that the State's theory at trial was that Lundskog was stomped to death by a person wearing sneakers with a "waffle type pattern" on the bottom.[5] The court further reasoned, "A shoe with a 'waffle

---

4. The district court also noted another possible, reasonable interpretation of the Notes, namely, that the Notes described the victim's injuries. Under this interpretation, the court believed that Gordon's first ground for relief would fail because the Notes would provide no basis to impeach the State's witnesses. Nevertheless, for purposes of summary judgment, the court accepted Gordon's interpretation of the Notes.

5. Gordon claims there was no evidence introduced that the assailant was wearing a shoe with a waffle-type pattern. The State concedes that "there was no evidence at trial that the murderer wore shoes with a waffle pattern." Nevertheless, Diaz-Hernandez testified that the assailant wore white tennis shoes, and the State's opening and closing statements at trial contended that bloody footprints were a corroborating detail because they were near the body and went in the direction Diaz-Hernandez said he watched the assailant move. In closing, the State argued that the footprints were Gordon's and the footprints came from the same right foot. The prosecutor also cited "[Medical Examiner]'s testimony as to the injuries, that those injuries were consistent with someone stomping on the head of . . . the victim." Although the word "waffle" is not in the trial transcript, the pictures of the bloody footprints clearly show that the sole had a waffle pattern along with the name Reebok. Taking these exhibits together with the State's position that the footprints corroborated Diaz-Hernandez's testimony about the assailant's movements, the State's theory essentially was that "Lundskog

(continued…)

pattern' unquestionably has . . . *more* rough and uneven edges and surface than a baseball bat (which is completely smooth and has no edges), especially when the shoe is being used to stomp with the heel." Thus, in the district court's view, the Notes were not inconsistent with the State's evidence at trial or its theory regarding the manner of death. It further concluded that although Gordon could have "used the Notes to question [Medical Examiner] and Detective . . . and maybe find some measure of disagreement," they "cannot 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict or sentence.'" (Quoting *Tillman v. State*, 2005 UT 56, ¶ 31, 128 P.3d 1123.) Because the court believed Gordon received a fair trial with a "'verdict worthy of confidence,'" it determined that his due process rights were not violated by the State's failure to disclose the Notes before trial. (Quoting *id.* ¶ 30.) Accordingly, the court denied Gordon's motion for summary judgment and granted the State's motion on Gordon's first ground for relief.

¶8 Later, the State filed another motion for summary judgment, this time arguing that Gordon's remaining grounds for relief were procedurally barred and failed on their merits. The district court granted this motion. In its ruling, the court determined that Gordon's second and third grounds for relief were both procedurally barred and meritless.

¶9 The court based its rulings on a provision of the PCRA providing that a person is not eligible for relief on any ground that could have been but was not raised at trial or on appeal. Utah Code Ann. § 78B-9-106(1)(c) (LexisNexis 2012). Regarding the second ground for relief, based on the State's failure to

---

(…continued)

was stomped to death by a person wearing sneakers with a 'waffle type pattern' on the bottom."

collect the blood-spattered cement panel from the crime scene, the district court determined it was "undisputed that trial counsel knew of the cement panel's existence from a series of photographs and notes that were part of the defense file at the time of trial." Based on this, the court determined that "[e]ither trial counsel knew that the State failed to preserve the cement panel or could have easily discovered that fact through discovery." Further, it determined that "whatever significance the cement panel has, it would have been apparent at the time of trial based on the photographs and police notes." As a result, Gordon could have raised at trial or on direct appeal the issue contained in his second ground for relief in the PCRA proceeding and thus was barred from raising it.

¶10    The district court determined the second ground for relief also failed on the merits. It reasoned that Gordon "ha[d] not even met the threshold requirement of 'a reasonable probability that [the cement panel] would be exculpatory[.]'" (Second and third alterations in original) (quoting *State v. Tiedemann*, 2007 UT 49, ¶¶ 44–45, 162 P.3d 1106). In its view, Gordon offered "mere speculation that the blood on the cement panel came from some unknown assailant" and "[n]othing . . . corroborate[d] [Gordon's] hunch that someone else committed the murder." The court supported this analysis by noting that "ample evidence" established Gordon as the killer. Moreover, it concluded Gordon did not show that the State acted with "any degree of culpability" in failing to collect the panel or that he was prejudiced by that failure. The court thus concluded that Gordon's state constitutional due process claim in the second ground for relief failed on the merits as a matter of law.

¶11    As for Gordon's third ground for relief, based on ineffective assistance of counsel, the district court determined that it was procedurally barred as well. The court reasoned that, even assuming his trial counsel was ineffective, Gordon "failed to explain why he could not have raised his ineffective assistance

claims on direct appeal." And although he might have avoided the procedural bar by showing that his appellate counsel was ineffective for failing to raise the issue on appeal, the court concluded that Gordon "failed to allege ineffective assistance of appellate counsel in his Petition" and therefore could not avoid the procedural bar for his ineffective assistance of trial counsel claim.

¶12 On the merits, the district court determined that, as a matter of law, Gordon failed to show he received ineffective assistance of trial counsel. It explained that Gordon did "not submit an affidavit from his trial counsel or any other evidence to suggest" that his trial counsel's performance fell below an objective standard of reasonableness. It also explained that Gordon had not shown prejudice, because "[w]hen viewed in the context of the entire record, trial counsel's decision [not] to present evidence of the cement panel or expert testimony to rebut the State's experts [did] not 'undermine confidence in the outcome.'" (Quoting *Lafferty v. State*, 2007 UT 73, ¶ 13, 175 P.3d 530.) Accordingly, the court granted the State summary judgment and dismissed Gordon's petition for post-conviction relief. Gordon now appeals.

ISSUES AND STANDARDS OF REVIEW

¶13 "We review an appeal from an order dismissing or denying a petition for post-conviction relief for correctness without deference to the lower court's conclusions of law." *Ross v. State*, 2012 UT 93, ¶ 18, 293 P.3d 345 (citation and internal quotation marks omitted). Likewise, "we review a grant of summary judgment for correctness, granting no deference to the [lower] court." *Id.* (alteration in original) (citation and internal quotation marks omitted). We will affirm such a decision "when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citation and internal quotation marks

omitted); *see also* Utah R. Civ. P. 56(a). "In making this assessment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Ross*, 2012 UT 93, ¶ 18 (citation and internal quotation marks omitted).

## ANALYSIS

¶14 Gordon contends the district court erred in granting summary judgment to the State and in dismissing his petition for post-conviction relief. Under the PCRA, a criminal defendant may obtain relief if he establishes that his "conviction was obtained . . . in violation of the United States Constitution or Utah Constitution" or if the defendant "had ineffective assistance of counsel." Utah Code Ann. § 78B-9-104(1)(a), (d) (LexisNexis 2012). Gordon's PCRA petition raised three claims for relief. His first and second claims stem from the contention that his constitutional rights were violated by the State's failure to disclose the Notes and to preserve the cement panel as evidence. Gordon's third claim is that his trial counsel rendered constitutionally ineffective assistance when he failed to discover or present evidence of the cement panel and expert testimony to refute the State's forensic evidence regarding the manner of Lundskog's death. We address each claim in turn.

### I. The Notes

¶15 Gordon first contends the district court erred in granting summary judgment to the State on his claim that he was deprived of due process when the State failed to disclose the Notes. The Notes—"Not Characteristic of 'Baseball Bat,'" "Instrument," "More rough & uneven Edges and surface"— suggested that the instrument used to inflict Lundskog's injuries had rough and uneven edges and surface.

¶16 In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "[T]he duty to disclose favorable evidence encompasses both exculpatory and impeachment evidence." *Tillman v. State*, 2005 UT 56, ¶ 27, 128 P.3d 1123 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). This duty is "implicated even if the evidence is known only to police investigators and not the prosecutor," *id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)), "and regardless of whether the evidence has been requested by the accused," *id.* (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

¶17 A *Brady* claim has three elements: "(1) the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the evidence was 'suppressed by the State, either willfully or inadvertently'; and (3) prejudice ensued." *Id.* ¶ 28 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). With respect to Gordon's *Brady* claim, the parties agree that the first two elements have been met for purposes of summary judgment, so the only issue before us is whether Gordon suffered prejudice as a result of the State's failure to disclose the Notes.

¶18 For the suppression of evidence to be prejudicial for *Brady* purposes, the evidence must be material. *Id.* ¶ 29. "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citation and internal quotation marks omitted). "A reasonable probability of a different result occurs when the government's evidentiary suppression undermines confidence in the outcome." *Id.* (citation and internal quotation marks omitted).

¶19   The Utah Supreme Court has outlined three guiding principles for weighing whether evidence is material under *Brady*. First, "the question is not whether the defendant would more likely than not have received a different [result] with the evidence, but rather, whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* ¶ 30 (alterations in original) (citation and internal quotation marks omitted). Second, "materiality . . . is not a sufficiency of the evidence test, and, therefore, not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the [fact-finder's] conclusions." *Id.* ¶ 31 (omission in original) (citations and internal quotation marks omitted). Rather, "[t]o establish materiality, a defendant need only show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict or sentence." *Id.* (citation and internal quotation marks omitted). And third, "the materiality of suppressed evidence must be evaluated in the context of the entire record." *Id.* ¶ 32.

¶20   On appeal, Gordon contends the Notes are material because they undermine the State's theory of the case by "identifying a different cause of injury and death." He asserts that had the Notes been available to his defense, he would have "challenged the State's theory" by "undercut[ting] the credibility of both Diaz-Hernandez, the State's 'most important witness,' who provided the basis for the State's theory, and [Medical Examiner], who corroborated that testimony." With respect to Diaz-Hernandez, Gordon argues that questioning about the Notes would have cast doubt on Diaz-Hernandez's testimony that he saw Gordon stomp Lundskog's head and would have led the fact-finder to reject Diaz-Hernadez's testimony completely. With respect to Medical Examiner, Gordon argues that the Notes would have allowed him to impeach Medical Examiner's testimony about the cause of death and his testimony that "the

blood-spattered cement panel (an item that indisputably has rough and uneven edges and surface) was not the cause of Mr. Lundskog's injuries."[6]

¶21 The State defends the district court's ruling that the Notes were not material, arguing that they add "nothing to the overall evidentiary picture developed at trial." The State asserts that because "[t]he evidence against Gordon was plentiful and included several key witnesses," the Notes would not have undermined all of Diaz-Hernandez's testimony. The State further asserts that "the issue raised at trial about Diaz-Hernandez concerned whether he was actually '100 percent' sure that the attacker was Gordon" and there was "no evidence at trial suggesting that Diaz-Hernandez was mistaken or had any motive to lie about seeing a person stomping on another."

¶22 To determine whether the Notes could reasonably be taken to put the whole case in such a different light as to

---

6. Gordon also contends on appeal that the district court erred in rejecting his first claim for relief "based on a misunderstanding of the record and an unsupported inference that should have been—but was not—drawn in his favor." In particular, Gordon asserts the district court's conclusions are problematic because "the State did not present evidence at trial that Mr. Lundskog was stomped to death by a person wearing sneakers with a 'waffle type pattern' on the bottom of the shoe" and because "the assumption that an athletic shoe has a rough and uneven edge and surface is based on pure speculation and is a negative inference that the court, at the summary judgment stage, was not entitled to draw." Our decision does not rely on whether the attacker wore sneakers with a waffle-type pattern or whether athletic shoes have rough and uneven edges although, as previously noted, *supra* note 5, the pictures of the bloody footprints in the record show a waffle-type sole of a Reebok.

undermine our confidence in the outcome, we must consider the entire evidentiary picture. The evidence was undisputed that blunt force trauma to the head killed Lundskog. An eyewitness, Diaz-Hernandez, reported seeing someone stomping on Lundskog and described the attacker as a short-haired black man wearing a light-colored shirt, baggy shorts, and white tennis shoes. Only one person who was filmed on the store's surveillance video around the time of the murder—Gordon—matched that physical description. Diaz-Hernandez later identified Gordon as Lundskog's attacker. Another witness, Mellen, testified he saw Gordon and Lundskog interact around the same time. Although the Notes may suggest that Lundskog's injuries could have been inflicted in another way, they do not directly undermine this evidence against Gordon or cast the whole case in a different light. And even though the State's theory did not suggest any cause for Lundskog's injuries other than being stomped with a foot, the only real issue at trial was the identity of Lundskog's attacker, not the precise manner of his death.

¶23   Gordon suggests the Notes would have entirely undermined Diaz-Hernandez's testimony, including his identification of Gordon. If Gordon had used the Notes during his cross-examination of Diaz-Hernandez, they might have revealed a conflict between Diaz-Hernandez's account and the physical evidence. But the Notes would not have elicited any motive on Diaz-Hernandez's part to lie and, significantly, they do not contain evidence of another perpetrator. Moreover, the Notes are not necessarily inconsistent with Diaz-Hernandez's account of the attack, because Diaz-Hernandez did not see the beginning of the attack and because it is plausible the attacker struck Lundskog with the panel and then stomped on him or that he struck his head on the panel when he fell to the ground.

¶24   Gordon also argues the Notes are material because they would have allowed him to impeach Medical Examiner's

testimony about the manner of Lundskog's death.[7] Although Medical Examiner noted in an affidavit that he "did not state that this was the only possible mechanism of injury," Medical Examiner testified at trial that Lundskog's injuries were consistent with someone stomping on his head with a foot and that he believed that "it was unlikely that [the cement panel] had been used as an implement or weapon to inflict [Lundskog's] injuries." Medical Examiner reiterated on cross-examination that his "impression was that the concrete panel did not cause the injuries." Even had Gordon been able to cross-examine Medical Examiner using the Notes, which suggested that the instrument used in the attack had rough and uneven edges, the affidavit Medical Examiner submitted for purposes of the PCRA proceeding made it clear that his testimony still would have supported the theory that at least some of Lundskog's injuries were caused by someone stomping on his head. During the PCRA proceeding, Medical Examiner, with the benefit of the Notes, averred that although Lundskog's head "could have come into contact with the concrete panel . . . it [was] unlikely that the attacker wielded the panel as a weapon or used it as an implement to strike the victim." Medical Examiner stated that it was "more likely" that the injuries to Lundskog's face "resulted from his head slamming into the stationary cement panel" and that "[s]uch injuries would be consistent with a scenario in which the attacker stomped on Mr. Lundskog's head while it

---

7. By affidavit, Gordon's trial counsel stated he was never provided with the Notes or with any other materials containing the information that the death was caused by an instrument with a rough and uneven edge and surface. Trial counsel further averred that had he had the Notes, he would have cross-examined Medical Examiner about his observations during the autopsy, the Notes, his opinion at trial that the cement panel was not the cause of the victim's injuries, and his opinion that the death was caused by stomping with a "shoed foot."

was positioned over or on top of the cement panel." Medical Examiner also opined that "numerous kicks or stomps would cause overlapping bruises that could make [a shoe] pattern less distinct or even unrecognizable." Medical Examiner's opinion, while allowing for the possibility that the cement panel played a role in inflicting Lundskog's injuries, still recognizes stomping by a shoed foot as the most likely cause of death. Thus, cross-examining Medical Examiner by using the Notes would have done little to undermine his testimony at trial or to alter the effect of that testimony.

¶25   Gordon claims that had he had the Notes at trial, he would have "cast further doubt on the thoroughness of a police investigation that failed to collect the blood-spattered cement panel—an instrument with 'rough & uneven edges and surface.'" But the nondisclosure of the Notes did not prevent Gordon from advancing such arguments, because the existence of the cement panel near Lundskog's head was known to Gordon at trial and because Gordon knew then that the State did not offer the panel as evidence. His ability to challenge the adequacy of the police investigation did not depend on his knowledge of the Notes.

¶26   In sum, the State's nondisclosure of the Notes does not undermine our confidence in the outcome at trial. Because the Notes do not implicate another perpetrator and because they would have done little to weaken the testimony of the State's witnesses, the Notes were not material for *Brady* purposes. Accordingly, the district court correctly granted summary judgment to the State on Gordon's first claim for relief.

II. Failure To Collect the Cement Panel

¶27   Gordon next contends the district court erred in granting summary judgment to the State on his second ground for relief. This claim alleged that his right to due process was violated when the police failed to collect or preserve the cement panel

from the crime scene. The district court determined that this claim was procedurally barred and failed on its merits.

¶28 On appeal, Gordon argues that because he "had no reason to raise this due process claim prior to his post-conviction proceedings," the district court erred in determining that his second ground for relief was procedurally barred. The procedural bar does not apply here, Gordon argues, because "given the State's suppression of the autopsy notes, coupled with [Medical Examiner]'s testimony that the cement panel was not the cause of the victim's injuries, Gordon's counsel was ignorant of specific facts relating to the cement panel's exculpatory significance." The State maintains that Gordon's second claim is barred because the Notes "were not needed for Gordon to raise this claim" and because "any utility the cement panel could have had for defense strategy should have been clear to Gordon from the start."

¶29 The PCRA specifies that a person is not eligible for relief if the petition is based "upon any ground that . . . could have been but was not raised at trial or on appeal." Utah Code Ann. § 78B-9-106(1)(c) (LexisNexis 2012). "This rule applies to all claims, including constitutional questions." *Rudolph v. Galetka*, 2002 UT 7, ¶ 5, 43 P.3d 467 (per curiam). A "defendant 'could have' raised a claim when he or his counsel is aware of the essential factual basis for asserting it." *Pinder v. State*, 2015 UT 56, ¶ 44, 367 P.3d 968. "And that conclusion holds even when the defendant later discovers additional evidence providing further support for the claim." *Id.*

¶30 The district court stated that it was "undisputed that trial counsel knew of the cement panel's existence from a series of photographs and notes that were part of the defense file at the time of trial." Gordon does not take issue with this factual statement but challenges the court's determination that "[e]ither trial counsel knew that the State failed to preserve the cement

panel or could have easily discovered that fact through discovery." According to Gordon, this determination confuses his claims because "simply knowing that the cement panel was present at the scene did not give rise to a destruction-of-evidence due process claim (even if [trial counsel] knew that the panel had not been collected)." Instead, Gordon explains, "it was the discovery of [the Notes] long after the appeal that gave rise to that claim."

¶31   We agree with the district court that the cement panel's potential evidentiary value was readily apparent at trial. As one of Gordon's experts noted, the crime scene photographs offered at trial show that "a piece of a large cement panel . . . which has both spattered and contact/transfer blood on its surface" is "clearly visible . . . and very close to Mr. Lundskog's head." These photographs clearly suggest the logical possibility that Lundskog came into contact with the panel and the possibility that the panel could have inflicted Lundskog's head trauma. Gordon's trial counsel explored these possibilities to a degree, asking Medical Examiner on cross-examination whether the panel was used to injure Lundskog. Although Medical Examiner testified it was unlikely the panel had been used as a weapon or an instrument to inflict injury, Gordon could have further explored whether the panel played some role in the attack. Gordon knew then that the State had not offered the panel itself as evidence, and he could have easily learned it was not collected. Had he done so, he could have filed a post-trial motion based on the State's failure to preserve the panel. Because the potential evidentiary value of the panel would have been apparent to Gordon and his attorneys at trial, their cognizance of the panel's importance would have allowed Gordon to discover and pursue a destruction-of-evidence due process claim at trial or in post-trial motions. *See Pinder*, 2015 UT 56, ¶¶ 51–55 (indicating that a petitioner, whose post-conviction claim alleged that the State doctored tape recordings presented at trial, could have brought the claim earlier because he had "ample grounds"

and "every motivation and opportunity" for pursuing an investigation into the authenticity of the recordings "at the time of trial or in anticipation of a post-trial motion").

¶32 Contrary to Gordon's position, the discovery of the Notes did not give rise to his second claim for relief. Rather, the Notes are merely "additional evidence providing further support for [his] claim." *See id.* ¶ 44. It is true the Notes give Gordon more reason to believe the cement panel held evidentiary value for his defense. But Gordon did not need the Notes to see that the panel could be significant. From the evidence available to him at the time of trial, Gordon could have discovered and raised a due process claim in post-trial motions based on the State's failure to collect the panel. *See id.* ¶¶ 53–55 (indicating that a post-conviction claim was procedurally barred where "the same basis for the investigation by post-conviction counsel was as readily available to trial counsel" even though trial counsel did not have the benefit of expert analysis). Accordingly, we agree with the district court that Gordon could have raised the issue in his second ground for relief either at trial or on direct appeal and thus Gordon was barred from raising it in the PCRA proceeding.[8]

---

8. In the event we conclude that his second claim for relief is procedurally barred, Gordon nevertheless asks us to reach its merits to avoid an obvious miscarriage of justice. In support, he relies on *Tillman v. State*, 2005 UT 56, 128 P.3d 1123, in which the Utah Supreme Court applied a good cause exception to examine the merits of an otherwise procedurally barred claim. *Id.* ¶¶ 19–26. The *Tillman* court relied on factors identified as common law exceptions to the PCRA's limitations in *Hurst v. Cook*, 777 P.2d 1029 (Utah 1989). *Tillman*, 2005 UT 56, ¶¶ 19–26 (citing *Hurst*, 777 P.2d at 1037). Since *Tillman*, however, the supreme court has acknowledged that legislative amendments have repudiated the *Hurst* exceptions and "the *Hurst* exceptions are available only for

(continued…)

III. Ineffective Assistance of Counsel

¶33    Finally, Gordon contends the district court erred in granting summary judgment to the State on his ineffective assistance of counsel claim. He alleged that his trial counsel was ineffective for failing to discover or present evidence of the cement panel and for failing to present expert testimony to refute the State's forensic evidence regarding the manner of Lundskog's death. The district court determined that this claim failed because it was procedurally barred and because it lacked merit. Gordon challenges both of these rationales on appeal.

¶34    With respect to the procedural rationale for dismissing Gordon's third ground for relief, Gordon contends that his "ignorance of specific facts relating to the cement panel's potential exculpatory significance made him and his counsel unable to raise his ineffective assistance claim on appeal," and therefore his claim is not procedurally barred. By contrast, the State urges us to affirm the court's conclusion that this claim is

_____

(…continued)
claims filed before May 5, 2008." *See Pinder v. State*, 2015 UT 56, ¶ 56, 367 P.3d 968; *see also Carter v. State*, 2012 UT 69, ¶ 23, 289 P.3d 542 ("In 2008, the legislature amended the PCRA to eliminate these common law exceptions."); *Taylor v. State*, 2012 UT 5, ¶ 11 n.3, 270 P.3d 471 (explaining that the "PCRA was amended in 2008 to 'extinguish' the common law exceptions found in *Hurst*" and "established the PCRA as the 'sole legal remedy' for petitioners seeking relief from a conviction or sentence" (citations omitted)); *Gardner v. State*, 2010 UT 46, ¶¶ 91–94, 234 P.3d 1115 (noting the 2008 amendments to the PCRA). Gordon's petition was filed *after* May 5, 2008, and he has not addressed this case law or the validity of the *Hurst* exceptions. As a consequence, he has not persuaded us that we should reach the merits of his second claim.

barred for the reason that Gordon failed to allege, much less demonstrate, that his appellate counsel rendered constitutionally ineffective assistance.

¶35    As stated above, a petitioner is not eligible for relief under the PCRA if his or her petition is based "upon any ground that . . . could have been but was not raised at trial or on appeal." Utah Code Ann. § 78B-9-106(1)(c) (LexisNexis 2012). This procedural bar applies to claims for ineffective assistance of trial counsel. *Johnson v. State*, 2011 UT 59, ¶ 10, 267 P.3d 880. Nevertheless, "if a claim in a post-conviction petition could have been but was not raised at trial or on appeal, such a failure is not barred 'if the failure to raise [the claim] was due to ineffective assistance of counsel.'" *Id.* ¶ 11 (alteration in original) (quoting Utah Code Ann. § 78B-9-106(3)). Thus, "[w]here, as here, the petitioner directly appealed his conviction and was represented by different counsel on appeal, the petitioner must demonstrate that failure to raise the claims on direct appeal constituted ineffective assistance by appellate counsel." *Alvarez-Delvalle v. State*, 2015 UT App 126, ¶ 2, 351 P.3d 104 (per curiam) (citing *Allen v. Friel*, 2008 UT 56, ¶ 25, 194 P.3d 903).

¶36    A "petitioner must set out all of his claims relating to the legality of his conviction or sentence in his petition for post-conviction relief and may not bring additional claims in later proceedings." *Kell v. State*, 2008 UT 62, ¶ 23, 194 P.3d 913; *see also* Utah R. Civ. P. 65C(d). Under *Strickland v. Washington*, 466 U.S. 668 (1984), to prove ineffective assistance of counsel, a defendant must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. Although the "standard for evaluating whether appellate counsel is ineffective is the same *Strickland* standard used to determine whether trial counsel is ineffective," *Kell*, 2008 UT 62, ¶ 42, a "claim for ineffective assistance of appellate counsel is distinct from a claim for ineffective assistance of trial counsel, especially if the two attorneys are different," *Pedockie v. State*,

2010 UT App 298U, para. 3 (per curiam). "To show that appellate counsel was ineffective in failing to raise a claim, the petitioner must show that the issue [was] obvious from the trial record and . . . probably would have resulted in reversal on appeal." *Kell*, 2008 UT 62, ¶ 42 (alteration and omission in original) (citation and internal quotation marks omitted).

¶37 We conclude the district court correctly determined that Gordon's third ground for relief was procedurally barred. Gordon's PCRA petition does not contain any challenge to the effectiveness of his appellate counsel. And before the district court, Gordon addressed his appellate counsel's performance only in a footnote in his memorandum in opposition to summary judgment, stating, "[I]f appellate counsel had the same facts, or ability to generate facts, as did trial counsel, and failed to take action on those facts, appellate counsel may well have been ineffective." Gordon did not provide any support for a claim of ineffective assistance of appellate counsel, nor did he attempt to amend his petition to add such a claim. Moreover, at the district court and on appeal, Gordon has offered no explanation for why his claim of ineffective assistance of appellate counsel was not brought in his PCRA petition. Because Gordon failed to bring and support a claim alleging ineffective assistance of appellate counsel, he cannot avail himself of an exception to the procedural bar to his ineffective assistance of trial counsel claim. *See Johnson*, 2011 UT 59, ¶ 11. Because Gordon's third claim for relief was procedurally barred, we affirm the district court's dismissal of that claim without reaching its merits.[9]

---

9. As with his second claim for relief, Gordon asserts that even if his third claim is procedurally barred, this court should reach its merits to avoid an obvious miscarriage of justice. But for the same reasons as discussed above, *supra* note 8, Gordon has not persuaded us to do so.

CONCLUSION

¶38 Gordon has not demonstrated that the district court erred in granting summary judgment to the State and dismissing his claims for post-conviction relief. The court correctly dismissed his claim related to the State's failure to disclose evidence because the nondisclosed evidence was not material. The court also correctly dismissed his second and third claims as they were procedurally barred. Accordingly, we affirm.

———————